<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHERMAN ABRAMS, : | |
| : | |
| Plaintiff, : | |
| : | **Civil Action No. 07-4975 (SRC)** |
| v. : | |
| : | **OPINION** |
| PORT AUTHORITY TRANS-HUDSON : | |
| CORPORATION, et al., : | |
| : | |
| Defendants. : | |

<u>**CHESLER**</u>, District Judge

     This matter comes before the Court on Defendants' motion for summary judgment on the Eleventh and Twelfth Counts of the Complaint [docket entry 20]. Plaintiff has opposed the motion. The Court has opted to rule based on the papers submitted and without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons expressed below, the Court will grant Defendants' motion in its entirety.

**I.   BACKGROUND**

     This action arises out of the termination of Plaintiff's employment with Defendant Port Authority Trans-Hudson Corporation ("PATH"). PATH is a wholly owned subsidiary of The Port Authority of New York and New Jersey, which is "a municipal instrumentality of New York and New Jersey created by a compact between these two states with the consent of Congress."

<u>Mineo v. Port Authority of New York & New Jersey</u>, 779 F.2d 939, 940 (3d Cir.1985).  The other Defendants named in the Complaint are Cynthia Bacon, Steven Abramopaulos and Robert Reich, three individuals employed by PATH.  The Court will when appropriate refer to PATH and the individual Defendants collectively as "Defendants."

Plaintiff Sherman Abrams ("Plaintiff" or "Abrams"), who is African-American, was employed by PATH in the position of Trackman I for approximately 13 years, until 2005 when his employment was terminated due a determination that he was physically unfit to perform his job duties.  A PATH Trackman I is responsible for track maintenance work.  The job description states that the Trackman I position requires the following "Physical Effort":

> Work involves considerable standing, bending, climbing, walking and heavy lifting.  Physical agility is necessary.  The incumbent must be able to stand for long periods of time (2-3 hours); must be able to remain in a crouched position for a period not to exceed 30 minutes in order to perform track maintenance work on a tunnel bench wall to allow safe train passage.  He/she must be able to climb benchwall ladders and get on or off a train from track level (involves stretching, bending, pulling and climbing); must be able to walk in track areas (involves walking on railroad ties, stone ballast and metal graftings).  The incumbent must be able to lift material weighing up to 100 pounds; must be able to use heavy hand tools weighing up to 45 pounds (i.e. sledge hammers, mauls, picks) must be able to use a 90 pound concrete breaker (jack hammer).  Also must be able to use electrical and air-powered tools (i.e. impact wrenches, drills).  The incumbent must be able to perform all essential functions outlined in Section III.

(Burke Decl., Ex. D-25, ¶ IV.C.)

The parties agree that Abrams is and was at all relevant times morbidly obese and moreover suffered from the chronic medical conditions of cellulitis[1] since at least 1998 and also phlebitis.[2] Plaintiff concedes that his medical problems required him to be absent from work at various times through the years. The record indeed would fairly support a characterization of these absences as frequent and prolonged. Attendance records provided by PATH show that from 1993 through 2005, Abrams was absent from work due to injury or illness for more than 282 weeks, which totals approximately 5½ years. In 2004, he was out sick for a total of approximately 23 weeks. His last period of continuous absence prior to his termination began on January 7, 2005. At some point between that date and February 14, 2005, Abrams notified his employer that he would be out due to illness until June 2005. The absence continued through August 1, 2005. The record does not show that Plaintiff returned to active employment at that time. Instead, it contains an August 2, 2005 letter advising Plaintiff that his employment was terminated effective on the date of his medical disqualification by PATH's Office of Medical Services.

---

[1] Webster's online dictionary defines cellulitis as a "diffuse and especially subcutaneous inflammation of connective tissue." http://www.merriam-webster.com/dictionary/cellulitis. The illness is caused by bacteria and characterized by redness (erythema), warmth, swelling, and pain. WebMD, Skin Problems & Treatments Health Center, Cellulits Topic Overview, http://www.webmd.com/skin-problems-and-treatments/tc/cellulitis-topic-overview. Some cases occur in areas of trauma, where the skin has been broken open, but people with diabetes or weakened immune systems can get cellulitis without having a break in the skin. Id.

[2] Phlebitis is the inflammation of a vein, most often in the leg. WebMD, Information and Resources, Phlebitis, http://www.webmd.com/a-to-z-guides/phlebitis.

It was on February 14, 2005 that Plaintiff's supervisor, Paul Moreno, sent a memorandum to Dr. Martin Duke of the Office of Medical Services requesting that the office conduct a job fitness evaluation of Abrams. In that memorandum, Moreno explained that he had become concerned about Abrams's ability to perform the duties of Trackman I. He based this concern on his review of deposition testimony given by Plaintiff's orthopedist on January 14, 2005 in connection with an unrelated lawsuit brought by Abrams against the Port Authority in New York state court. Moreno cited to portions of the transcript in which the orthopedist, Dr. Robert Lee, testified that when he examined Abrams in July 1998, he recommended that he should be in a job that doesn't require a great deal of walking, walking on uneven surfaces and prolonged periods of standing. By contrast, Moreno stated that the Trackman I position requires "considerable walking, standing and walking on even surfaces." (Burke Decl., Ex. D-32.)

Dr. Leonard Jaffe evaluated Plaintiff on behalf of PATH on March 8, 2005. He opined that Plaintiff would be suited to a sedentary position and concluded: "If a sedentary position is not available or it means that this sedentary light-duty position means walking, climbing stairs and getting up and down from a seated position, I do not think he is going to be able to perform those tasks either, in which case he might be considered disabled from being able to work at his regular or even the light-duty work, even the sedentary job." (Id., Ex. D-33.) Based on Dr. Jaffe's March 8 report, the PATH Office of Medical Services issued an opinion on March 15, 2005 stating that Abrams was fit for duty as a Trackman with certain permanent restrictions: "no lifting over 50 pounds, no squatting, bending or climbing; no prolonged standing or walking . . . ." (Resnick Cert., Ex. 10.) Plaintiff's orthopedist Dr. Lee issued his own report of April 6, 2005, based on his examination of Abrams the previous day. Dr. Lee agreed with Dr. Jaffe in

part but opined, in contrast, that Mr. Abrams could return to his Trackman work. Dr. Lee specifically stated that Abrams "can work regular duties as long as he does not have to ambulate on uneven surfaces to cause his problem to progress." (Burke Decl., Ex. D-34.) Dr. Jaffe issued a second report on April 14, 2005, which was tailored to assessing Abrams's fitness for the Trackman I job. It expressed Dr. Jaffe's opinion that, having reviewed the requirements of the Trackman I job, Abrams would not be able to perform those duties. Ultimately, on April 29, 2005 Dr. Duke issued a report to Plaintiff's supervisors stating that Abrams was evaluated in the Office of Medical Services on April 28, 2005 and that the office concludes that "he was never fit to perform the duties of Trackman I." (Id., Ex. D-36.) Dr. Lee then issued two letters additional to his initial report. Similar to the April 6, 2005 report, the May 17, 2005 letter expressed that Abrams could "return to work as a trackman with modifications. The modifications being that he is not to ambulate on excessive inclines." (Id., Ex. D-38.) The June 6, 2005 letter, however, stated that based on his June 3, 2005 examination of Abrams, Dr. Lee was of the opinion that Abrams could "return to full duty as a trackman." (Id., Ex. D-44.)

     Based on the assessment of the Office of Medical Services, PATH advised Plaintiff by letter of May 18, 2005 that pursuant to the terms of the Memorandum of Agreement, the collective bargaining agreement between PATH and Plaintiff's labor union the Transport Workers Union ("TWU"), his status as a PATH employee terminated as of April 29, 2005, the date he was found medically unfit for the Trackman I job. He was further advised that while an Employee Review Committee would be convened to identify a vacant position for which he may be qualified, PATH made no guarantee of continued employment and reserved its right to terminate Plaintiff should a suitable position not be identified or should he fail to cooperate with

PATH in the process. No suitable positions were found. Subsequently, on June 24, 2005, the TWU requested, on Plaintiff's behalf, that a Medical Board be convened pursuant to the Memorandum of Agreement, which, in relevant part, provided for a dispute resolution procedure in the event that an employee who has been found by PATH to be medically unqualified to perform his duties presents his own doctor's opinion to the contrary. The procedure called for a board comprised of a doctor designated by PATH, one designated on Plaintiff's behalf, and a third doctor jointly selected by both employer and the labor union and/or the employee who would examine the employee and render his or her own independent assessment. Plaintiff's doctor, Dr. Lee, and PATH doctor Dr. Duke agreed upon Dr. Clifford J. Schob. Dr. Schob reviewed the medical records, considered the job duties of Trackman I and, on September 13, 2005, examined Abrams. His report of the same date concluded that Plaintiff should "find a less vigorous and demanding occupation." (Burke Decl., Ex. D-46.) In his statement of facts, however, Plaintiff contests the independence of Dr. Schob's evaluation and notes that Dr. Schob later admitted that he had in the past performed defense-sided permanency exams for PATH and issued a supplemental report of November 14, 2005 opining that Abrams should be allowed to return to work as a Trackman I if he is able to perform his tasks.

 By this time, however, Plaintiff had been notified by letter dated August 2, 2005 that his employment was terminated effective on the date of his medical disqualification. Moreover, a grievance filed by Plaintiff's labor union challenging the conclusion reached by the Board of Doctors was denied as meritless by a Special Board of Adjustment convened to consider the grievance. After holding a hearing and reviewing the evidence, the Special Board of Adjustment found no reason to disturb the conclusion reached by the Board of Doctors that Plaintiff was

physically unable to work as a Trackman I.  It considered Abrams's position that Dr. Schob had retracted his initial assessment and specifically noted, among other things, that Dr. Schob's November 14, 2005 supplemental report did not state that he finds Mr. Abrams to be physically capable of performing the duties of Trackman I nor did it give a medical reason that would alter Dr. Schob's conclusion in the September 13, 2005 report that Mr. Abrams was not physically qualified for the job.

Plaintiff filed this lawsuit on August 2, 2007.  The action was removed to this Court pursuant to 28 U.S.C. § 1441 on the grounds that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The Complaint asserted thirteen separate counts, including various claims under the New Jersey Law Against Discrimination and New Jersey Civil Rights Act.  Following motion practice, most of the claims in the Complaint were dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  The claims that continue to exist in this matter are the section 1983 claim asserting violation of the Fourteenth Amendment right to equal protection based on his physical disability (Eleventh Count), the section 1983 claim for the alleged race-based violation of his equal protection rights (Twelfth Count), and the section 1983 claim for First Amendment retaliation (Thirteenth Count).  In the instant motion, Defendants have moved for summary judgment on the equal protection claims.[3]

---

[3] Defendants have indicated that they intend to move for summary judgment on the First Amendment claim as well, and the Court has given them leave to do so in a motion that will be separately filed and briefed.

**II.    DISCUSSION**

The standard upon which a court must evaluate a summary judgment motion is well-established.  Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000).  In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party.  See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 247-48.  The Supreme Court has held that and Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for

item, each piece of evidence proffered by the movant," but "must exceed the 'mere scintilla' threshold").

To reiterate, Defendants challenge two of the remaining claims asserted by Plaintiff in the Complaint, both section 1983 claims seeking redress for the allegedly unconstitutional disparate treatment of Plaintiff based on disability (Eleventh Count) and based on race (Twelfth Count). To establish a claim under section 1983, a plaintiff must demonstrate that the challenged conduct was committed by (1) a person acting under color of state law and (2) that the conduct deprived him of rights, privileges, or immunities secured by the Constitution or the laws of the United States.  See Parratt v. Taylor, 451 U.S. 527, 535 (1981).  Defendants do not take issue with the first element of Plaintiff's section 1983 claims but rather move for summary judgment on the grounds that Plaintiff cannot, as a matter of law, meet his burden of proving that Defendants have engaged in conduct that violates the Equal Protection Clause, the source of rights on which Plaintiff bases his claims.

Taking each of the claims at issue in turn, the Court concludes that Plaintiff's disability-based equal protection claim cannot withstand Defendants' motion for summary judgment. Plaintiff contends that Defendants terminated his employment due to his physical disabilities of morbid obesity and cellulitis, thus violating his Fourteenth Amendment right to equal protection.[4] To establish an equal protection claim based on disability, a plaintiff must demonstrate that "there is no rational relationship between the disparity of treatment and some legitimate governmental purpose."  Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 377

---

[4] The Equal Protection Clause provides, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

9

(2000). Put differently, state action predicated upon an individual's physical disability does not give rise to a constitutional violation unless such a rational basis for the action is lacking. Id. at 367. "Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather , the burden is upon the challenging party to negative 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Id.

The record before the Court in this case clearly supports a rational basis for PATH's decision to terminate Plaintiff based on his disability. Doctors evaluating Plaintiff concluded that, due to his morbid obesity and cellulitis, he was physically incapable of discharging the duties of his PATH job as Trackman I. The collective bargaining agreement between PATH and Plaintiff's labor union specifically contemplates termination due to medical disqualification. Pursuant to that agreement and based on the three-doctor panel convened to determine Abrams's fitness for the job, PATH terminated Plaintiff. Defendants have articulated a rational basis for their action - their legitimate interest in not continuing to employ an individual who is not capable of performing the required duties of a Trackman I. Plaintiff has proffered no facts which would negative PATH's rational basis for treating Plaintiff differently from other employees on grounds of his physical disability.

The Court notes that in his opposition brief, Plaintiff makes a number of inapposite arguments about the failure of PATH to provide reasonable accommodations for his disability. These have no bearing on his Fourteenth Amendment equal protection claim brought pursuant to section 1983. The Supreme Court has expressly rejected the proposition that the Equal Protection Clause encompasses such an affirmative obligation on state actors. It held as follows:

> States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards such individuals are rational. They could quite hardheadedly - and perhaps hardheartedly - hold to job qualification requirements which do not make allowance for the disabled. If special accommodations for the disabled are to be required, they have to come from positive law, and not through the Equal Protection Clause.

Id. at 367-68. The authority Plaintiff cites in support of his position that, regardless of any inability to perform the full duties of Trackman I "it was still up to PATH to try to reasonably accommodate his condition" (Pl. Br. at 16) deals with the Americans with Disabilities Act ("ADA"). Though this law does place an affirmative duty on various entities to make reasonable accommodations for the disabled, the Court will not discuss the applicability of the ADA to this case because Plaintiff has not pled an ADA claim. Plaintiff also makes arguments about employment-related retaliatory treatment, citing to cases dealing with claims brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq. ("Title VII"), and about retaliation for the exercise of First Amendment rights. These arguments are not relevant, however, to the claims challenged in the instant motion for summary judgment, and they do not salvage his equal protection claim premised on disparate treatment due to disability.

His race-based equal protection claim also lacks merit, but must be examined separately by the Court according to the analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In that case, the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). Although the disparate treatment claim at issue is grounded in the rights guaranteed by the Constitution, and thus pleads

11

for relief pursuant to section 1983 and not Title VII, both the Supreme Court and the Court of Appeals for the Third Circuit have applied the McDonnell Douglas framework to "racial-discrimination-in-employment claims under 42 U.S.C. § 1983." See id. n. 1; Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997).

McDonnell Douglas organizes the burden of production into three parts. First, the plaintiff must first establish a prima facie case by a preponderance of the evidence. St. Mary's Honor Ctr., 509 U.S. at 506. This creates a presumption of discriminatory intent by the defendant. Id. Then, the burden shifts to the defendant-employer to produce evidence that the adverse employment action was taken "for a legitimate, nondiscriminatory reason." Id. at 507 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). By meeting its burden of production, the employer succeeds in rebutting the presumption favoring plaintiff's case of race-based disparate treatment. Id. The Supreme Court has stressed that the burden is on the defendant employer to come forward with evidence, not to persuade the jury that its unlawful discrimination was not the cause of its employment action. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff." Id. (quoting Burdine, 450 U.S. at 253). To prevail on his claim, the plaintiff must demonstrate that the employer's proffered non-discriminatory reason for the employment decision was not the true reason but rather pretextual. Id.; see also Stewart, 120 F.3d at 432.

Summary judgment in favor of Defendants on the race-based disparate treatment claim comes down to Plaintiff's inability, on the record before the Court, to prove the pretext prong of the McDonnell Douglas analysis. Viewing the facts in the light most favorable to Plaintiff, the

Court assumes he could establish a prima facie case of racial discrimination.  A prima facie case requires proof that (1) plaintiff is a member of a protected class, (2) plaintiff is qualified for the job at issue, (3) plaintiff suffered an adverse employment action, such as discharge from the position, and (4) the circumstances of such action indicate unlawful discrimination, such as the filling of the position by one who is not a member of the protected class.  Burdine, 450 U.S. at 253; Jones v. School Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999).  While there is clearly debate between the parties concerning Abrams's qualification for the job of Trackman I in regards to the position's physical requirements, the Court will accept for purposes of this motion that the reports and deposition testimony of his treating orthopedist Dr. Lee amount to sufficient evidence to create a genuine issue of fact and make possible a jury finding in his favor on this element.  Plaintiff has also proffered evidence of the other elements: he is African American, was terminated from his job and has pointed to the continued employment of white employees he contends have significant disabilities similar to or more severe than his.  (Resnick Cert., Ex. 36, 37.)  Plaintiff can nevertheless not prevail on his disparate treatment claim as a matter of law because he has come forward with no evidence that would negate or even cast doubt on PATH's legitimate and non-discriminatory reason for terminating his employment.  The Third Circuit has elaborated on what proof of pretext entails:

> The plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the . . . plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

13

Stewart, 120 F.3d at 432-33 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (alteration in original)).  PATH has clearly met its burden of production, pointing to overwhelming evidence that supports its determination that Abrams was unable to meet the physical demands of the Trackman I position and accordingly should be discharged from the position in compliance with the collective bargaining agreement.  The Court stresses that in reviewing the merit of Plaintiff's section 1983 claim, its role is not to consider whether the defendant employer made a correct decision or to sit in review of the procedures which were invoked pursuant to the labor union contract.  The issue before the Court is whether there is evidence in the record which would reasonably permit the jury to either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 433.  The Court finds that the record is devoid of such evidence of pretext, and as such, Plaintiff could not prevail on his claim that PATH terminated him because of his race, in violation of the Fourteenth Amendment's Equal Protection Clause.

In concluding that Defendants' motion for summary judgment should be granted in its entirety, the Court must make clear that the two section 1983 claims analyzed above are deficient as to the public entity employer for an additional reason, as raised by Defendants in their brief.  To establish section 1983 liability against a governmental entity, such as PATH, a plaintiff must demonstrate that his alleged deprivation of rights occurred as a result of a custom or policy of the entity.  Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690, 694 (1978); Simmons v. City of Phila., 947 F.2d 1042, 1064 (3d Cir.1991), cert. denied, 503 U.S. 985 (1992). It is well-

established that municipal or public entity liability for civil rights violations does not arise under a theory of respondeat superior. Monell, 436 U.S. at 691. Rather, "municipal liability under § 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembauer v. City of Cincinnati, 475 U.S. 469, 483 (1986). Thus, apart from his failure to establish a genuine issue of fact as to whether he has been unlawfully deprived of his equal protection rights under the Fourteenth Amendment, Plaintiff's claims against PATH cannot surmount Defendants' motion for summary judgment because he has not pointed to any facts on which a factfinder could conclude that PATH had a policy that encouraged or tolerated unlawful disparate treatment in its employment decisions.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion, ordering summary judgment in their favor on the equal protection claims pled in the Eleventh and Twelfth Counts of the Complaint. An appropriate form of Order will be filed.


   s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

DATED: March 26, 2010